**UNITED STATES of America, Appellee,**

v.

**John KELLERMAN, Charles Rivezzo, Philip Travers and Joseph Vergo, Appellants.**

**Nos. 662, 663, 630 and 681, Dockets 34380, 34389, 34599 and 34600.**

United States Court of Appeals, Second Circuit.

Argued March 20, 1970.

Decided July 24, 1970.

Certiorari Denied Dec. 14, 1970. See 91 S.Ct. 356.

Leo Nachbar, Brooklyn, N. Y., for appellant John Kellerman.

Michael S. Fawer, New York City (Neal J. Hurwitz, and John S. Martin, Jr., New York City, of counsel), for appellant Charles Rivezzo.

David M. Markowitz, New York City, for appellant Philip Travers.

Charles A. Stillman, New York City (Leonard S. Machtinger, New York City, of counsel), for appellant Joseph Vergo.

Walter M. Phillips, Jr., Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., S. D. New York, Ross Sandler, and Jack Kaplan, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before MOORE and FEINBERG, Circuit Judges and BONSAL,* District Judge.

MOORE, Circuit Judge:

Four defendants, John Kellerman, Charles Rivezzo, Philip Travers and Joseph Vergo appeal from judgments of conviction after a jury trial upon an indictment charging (1) a conspiracy to violate the mail fraud statute, 18 U.S.C. § 1341 and (2) twenty substantive violations thereof. A codefendant Joseph Pucci pleaded guilty during the trial to twelve of the twenty-two counts. Another defendant, Alphonse Confessore, also convicted, died before sentence. Judgment of acquittal as to all defendants was granted on count twenty-two.

The conspiracy was to sell and distribute counterfeit Diners' Club credit cards. Each defendant played a different role in the conspiracy. Beginning in February 1967 Diners' Club had its credit cards embossed by the Dashew Business Machines Co. where the defendant Confessore was employed as a mechanic to service its embossing machinery. A large machine known as a "databosser" performed the embossing operation. Confessore had access to this machine and to smaller portable embossing machines known as "datatypers."

* Of the Southern District of New York, sitting by designation.

Confessore was a neighbor of the defendant Kellerman. In May 1967 Kellerman told the defendant Pucci that for $7,500 he would sell a portable embossing machine, credit cards and data cards containing the names and numbers of real Diners' Club cardholders. Pucci then approached the defendant Travers who indicated that he knew of someone who might be interested.

Thereafter Kellerman and Pucci met with Confessore who stated that the offer was his—not Kellerman's—and that no cards would be furnished with the machine. This information was relayed to Travers. At a subsequent meeting between Confessore, Pucci and Travers, Confessore agreed to supply 500 unembossed cards, the price to be increased to $10,000. Travers then introduced Pucci to the defendant Rivezzo who was represented as being interested in the Confessore offer. Rivezzo wished to see the machine and the cards.

The portable machine, a box of embossed and a box of unembossed cards were taken by Confessore and Kellerman to the basement area of a house in which the defendant Vergo and other tenants lived. The basement was apparently used by the tenants in common and was under the control of the landlord, Bini, and not of any particular tenant. There Vergo assisted in setting up the machine. Present also were Pucci, Rivezzo and Travers. They were unsuccessful in their attempt to cause the machine to function properly. A future meeting was scheduled. The machine and the embossed cards were left in Vergo's basement, the unembossed cards being taken by Travers to his home.

The second attempt to operate the machine failed and Confessore told Pucci, Rivezzo and Travers that he would have to buy additional machines, an additional datatyper and a machine to tip the embossed characters in • black. The money for this purchase was produced by Rivezzo. The purchase of the additional machines was consummated but no counterfeit cards were embossed by the defendants. Previously, however, Pucci had taken from the box of embossed cards a counterfeit card in the name of Joseph C. Giletto in replacement of a card which Confessore had given to him and which he thought was better suited to his appearance than the other counterfeit card in the name of an "Irishman." This Giletto card was used by Pucci on many occasions, Travers being present at times and on one occasion requesting use of the card for his benefit. These uses are the subject of the substantive counts, and include items ranging from $337.89 and $303.51 (Northeast and American Airlines, respectively) down to $11.10 at a restaurant. Other facts are set forth in connection with the consideration of defendants' claims of error.

Pucci was the principal witness for the Government; the other defendants did not testify. The appellate arguments advanced on behalf of each defendant must be considered separately.

*Kellerman*

With respect to the conspiracy count, Kellerman in effect attacks the sufficiency of the evidence relating him to the conspiracy. As to the substantive counts, Kellerman claims that Pucci's use of the Giletto credit card for himself did not establish Kellerman's guilt. Lastly, Kellerman complains that his counsel was not allowed on cross-examination to elicit Pucci's address at the time of trial.

*Rivezzo*

Rivezzo argues that the evidence, at best, showed a scheme to obtain blank credit cards, an embossing machine and to sell the embossed cards to third persons. Therefore, Rivezzo claims that no violation of the mail fraud statute has been established and that the indictment should be dismissed. He cites Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) as requiring this result. As to the substantive counts, Rivezzo asserts that Pucci's use of the Giletto card was not in furtherance of any conspiracy in which he may have been involved. Errors in the admission of exhibits and certain allegedly ir-

relevant testimony are set forth as additional grounds for reversal.

### Travers

Travers also relies on the *Parr* decision. He contends in addition that the actual use by Pucci and himself of the Giletto card would constitute a separate conspiracy and that there was insufficient evidence to connect that conspiracy with the larger one for which all were convicted.

### Vergo

Vergo adopts the arguments advanced in the Kellerman and Rivezzo briefs and claims that they apply with even greater weight to him. He also urges (1) error in the denial of his motion to suppress certain evidence seized in Vergo's house without a warrant and (2) that our recent decision in United States v. Bless, 422 F.2d 210 (2d Cir. 1970) requires reversal of his conviction.

### I.

■ In an attempt to bring their case into close analogy with Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), defendants would construe their conspiracy as merely involving the sale of an embossing machine, unembossed Diners' Club cards and IBM cards. They argue that the scheme ended at this point, the sale would have been completed without any use of the mails and, hence, the fact situation in *Parr* is paralleled. However, this argument overlooks the nature of a Diners' Club card. The card has no value *qua* card. The conspirators hopefully were realizing $7,500 to $10,000 from a purchaser who in turn would capitalize on his purchase by selling and putting into circulation these spurious Diners' Club cards. In the hands of this ultimate purchaser, their value would be found in the obtaining of merchandise and services at the expense of the real cardholders and the suppliers. This ultimate use and the attainment of this

ultimate objective required the use of the mails. The courts will not be so unworldly or naive as to be unaware of the vast volume of purchases made throughout this country and probably throughout the world by means of credit cards, Diners' Club and many others. No lesser knowledge was possessed by these conspirators.

Since the fraudulent use of a credit card constitutes mail fraud, so also does a conspiracy to put spurious cards into circulation. The *Parr* and *Kann*[1] cases, relied on by appellants do not present similar fact situations. In *Parr* the Supreme Court was quite explicit in limiting its decision to the particular facts before it. There certain employees of a School District used the District's credit card to obtain gasoline and services for themselves. The scheme was in effect misappropriation and embezzlement of the District's property. The crime was completed upon receipt of the gasoline and services. Once the property was received, the defendants had no further interest in the billing practices of the service stations involved. All that the Supreme Court held was "Here, as in *Kann*, '[t]he scheme in each case had reached fruition' when Carrillo and Garza [the District's employees] received the goods and services complained of. 'The persons intended to receive the [goods and services] had received [them] irrevocably. It was immaterial to them, or to any consummation of the scheme, how the [oil company] * * * would collect from the [District]. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires.' 323 U.S. at 94, 65 S.Ct. 148."

*Parr* and *Kann* have been distinguished on a factual basis in Kloian v. United States, 349 F.2d 291, 5th Cir. 1965, cert. denied, 384 U.S. 913, 86 S.Ct. 1349, 16 L. Ed.2d 365 (1966) and in Adams v. United States, 312 F.2d 137, 5th Cir. 1962. The Supreme Court itself in United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.

---

1. Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944).

Ed.2d 136 (1962) distinguished *Parr* and *Kann* in upholding an indictment which alleged potential use of the mails as part of a scheme to defraud, a decision which Mr. Justice Douglas in his lone dissent felt "materially qualifies". Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277.

In *Kloian* the court pointed to the distinguishing features, saying: "There [*Parr* and *Kann*] the fraud operated through the abuse of offices held by defendants. It sounded in larceny after trust," 349 F.2d at 294. Far more pertinent to the facts here is the court's comment in *Adams* that "Appellant's scheme reasonably contemplated the utilization of a commercial practice which, taken in its entirety, embraced the use of the mails," 312 F.2d at 140.

█ Each defendant would isolate himself from a general conspiracy by claiming only partial participation. It is true that each defendant may not have been present on every occasion and each may have had a somewhat different role but the thread of continuity was as visible as Ariadne's thread which led Theseus safely through the Cretan labyrinth after his Minotaur adventure. The thread here is less serpentine—Confessore-Kellerman; Kellerman-Pucci; Pucci-Travers; Travers-Rivezzo, and then to Vergo's house to try to operate the machine and there to store a box of cards, Vergo assisting. The evidence was clearly adequate to justify the jury's verdict.

█ The point made that the machine failed to operate and that, therefore, the conspiracy was frustrated and aborted is not legally sound. A conspiracy does not require successful completion of the objects thereof.

## II.

█ The substantive counts present a more serious problem. Was Pucci's surreptitious filching of a card to replace the card Confessore had given him and a card for his girl friend a plausible part of the conspiracy? The conspiracy did contemplate use of the cards and there was actual use by Pucci and desired use by Travers.

Rivezzo, in particular, claims that under Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), Pucci's use of his card "did not fall within the scope of the unlawful project," *id.* at 647, 66 S.Ct. at 1184, and that at best it was a separate Pucci-Travers conspiracy. This argument is based upon the assumption that the proof clearly showed two separate conspiracies instead of one and that proof of the alleged Pucci-Travers conspiracy and Pucci's use of the card was prejudicial to him on the conspiracy count. However, the indictment charged only a single conspiracy. It was for the jury to determine whether Pucci's and Travers' activities came within the purposes of that conspiracy and in pursuance thereof. If, as the jury must have found, Rivezzo was a member of the conspiracy, he was properly convicted under the *Pinkerton* doctrine on the substantive counts as well.

## III.

Reversible error is asserted because of the receipt in evidence of 110 and 114 embossed Diners' Club cards (Government's Exhibits 1 and 2, respectively). Defendants argue that there was no explanation of the part, if any, which these cards played in the conspiracy. Of a somewhat similar character are Exhibits 7 and 31. Exhibit 7 was a schedule of duplicate embossed Diners' Club cards uncovered by Diners' Club investigators during the period February 1967 through March 1968 together with certain information relating to the cards. This schedule had 636 entries, 224 of which were the cards listed in Exhibits 1 and 2. Exhibit 31 contained 415 entries and was designed to show the total amount of fraudulent charges incurred by the use of duplicate cards over a period from February 1967 to June 1968, a total of $719,887.23. Both Exhibits (7 and 31) were stricken by the Court prior to submission of the case to the jury.

█ During the trial of every case, the proof has to be introduced step by

step and through individual witnesses. It is often impossible to foresee the relevance of testimony or of an exhibit—particularly in the early stages of the trial. Hence the necessity of receiving the testimony or exhibit "subject to connection"—an expression which is anathema to most trial lawyers. If the testimony or exhibit is ultimately stricken, of course, there is prejudice to the party against whom it is temporarily received. The effectiveness of the judge's charge to disregard such evidence has been debated and challenged for generations. The answer is probably to be found by trying to evaluate the degree of prejudice because no instruction can erase from any juror's mind that which he has just heard or seen. But the entire jury system is dependent upon the assumption—whether it be fiction or not—that the jury will follow the court's instructions. It is only in extreme cases that this fiction is disregarded. Witness the change from *Delli Paoli* [2] to *Bruton*.[3]

In this case the testimony and exhibits supplied a colorful backdrop and illustrated the size of the potential loss which might be inflicted on Diners' Club by the success of the conspiracy but their introduction does not constitute reversible error because the proof of the conspirators' acts was more than adequate to enable the jury to find them guilty regardless of the monetary damage inflicted on Diners' Club under other circumstances.

### IV.

After suspicion had focused on Confessore, he made statements to Diners' Club employees which Rivezzo claims were inculpatory as to him and not contemplated by, or in furtherance of, the conspiracy. Admission of this testimony, Rivezzo argues, was reversible error. It may well have been an unsuccessful attempt by Confessore to exculpate himself or a statement to divert Diners' Club suspicions from his co-conspirators. In any event admission of this testimony does not come within the ban of *Bruton*.

### V.

Other errors advanced by Rivezzo, namely, the Stein testimony (American Express card given by Confessore to Stein prior to commencement of the conspiracy with promise of Diners' Club card in the future), the Chincotta testimony (purchase by Chincotta from Travers of blank Diners' Club cards on July 24, 1967 after arrest of Confessore and Pucci) and Pucci's testimony regarding Confessore's offer of a proposition whereby Pucci could earn $75,000 in an unrelated criminal venture (stricken by the Court) do not require reversal. At most they were collateral to the facts upon which the conspiracy was based. In the same category was the Court's curtailment of cross-examination as to Pucci's specific address. The denial of the motion to suppress was proper. The area searched was not Vergo's exclusively. Furthermore, the search was made with the consent of the owner, Bini.

The judgments of conviction are affirmed.

---

2. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957).

3. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).