**UNITED STATES of America, Appellee,**

v.

**Robin ELLIOTT, also known as Terrence Wells, Defendant–Appellant.**

**No. 144, Docket 94–1059.**

United States Court of Appeals, Second Circuit.

Argued Oct. 11, 1994.

Decided March 21, 1995.

Andrew P. Gaillard, Asst. U.S. Atty., Bridgeport, CT (Christopher F. Droney, U.S. Atty. for the D. of Conn., New Haven, CT, on the brief), for appellee.

Michael O. Sheehan, Asst. Federal Public Defender, New Haven, CT (Thomas G. Dennis, Federal Public Defender, New Haven, CT, on the brief), for defendant-appellant.

Before: LUMBARD, KEARSE, and MINER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Robin Elliott appeals from a judgment entered in the United States District Court for the District of Connecticut following his conditional plea of guilty before José A. Cabranes, then-*Chief District*

*Judge* \*, convicting him, as a convicted felon, on one count of possessing a firearm, in violation of 18 U.S.C. § 922(g)(1) (1988), and sentencing him principally to 292 months' imprisonment, to be followed by a five-year period of supervised release. On appeal, Elliott challenges the district court's denial of his motion to suppress evidence, contending principally that the district court erred in ruling that the police officers reasonably believed they had authority to enter the premises in question. For the reasons below, we agree with the ruling of the district court and affirm the judgment of conviction.

## I. BACKGROUND

There is little dispute as to the facts. Elliott was arrested on February 19, 1993, at 26 Garden Street in Stamford, Connecticut ("26 Garden"). 26 Garden was a two-story building containing four legal dwelling units, two on each floor. Within each single legal unit there were four bedrooms, each opening onto a shared hallway and kitchen area. For several years, the building's owners Carl and Mark Lupinacci had rented a legal unit's four bedrooms individually to unrelated tenants. In February 1993, Sharil Frederick and Quinton Carrington were tenants at 26 Garden. Frederick was Elliott's sister.

### A. *The History of 26 Garden*

For some years prior to 1993, the Lupinaccis had been concerned about trespassing and criminal activity at 26 Garden and other nearby properties they owned. In December 1989, they wrote to the Stamford Police Department and authorized the police to enter the premises in order to make arrests. The letter stated:

> As owners of these houses we are concerned with the amount of criminal activity that seems to gravitate around these houses.
>
> This letter is to inform you that we have posted No Trespassing signs. We hereby give the Police our permission and enthusiastic support to arrest anyone on these

properties (who is not a tenant or guest of a tenant) for trespassing.

> We have repaired the rear fence at least four times only to find it cut the very next day. This thoroughfare, if sealed off, I believe would cut down traffic considerably. But short of building a sheer 8 ft. masonry wall, I am at a loss as to how to secure it.
>
> We often find complete strangers and known trouble makers loitering on the porches or cutting through.

(Lupinaccis' Letter dated December 21, 1989 (emphasis omitted).)

Between December 1989 and February 1993, the Lupinaccis gave the police department keys to the external doors at 26 Garden; when locks were replaced, the Lupinaccis provided new keys to the police. Carl Lupinacci ("Lupinacci") had frequent discussions with individual Stamford police officers, and he urged them to patrol the shared areas inside the building. 26 Garden was the scene of homicides, narcotics activity, stabbings, and other serious assaults. Stamford police officers routinely entered 26 Garden, and they made numerous arrests.

### B. *The Events Involving Elliott*

The unit pertinent to the present case (hereinafter referred to as "Unit A") was located on the right side of the first floor of 26 Garden. In early February 1993, three of Unit A's bedrooms were unrented, and the unit's only remaining tenants were Frederick and Carrington. Frederick and Carrington were tenants of a bedroom referred to as bedroom # 1; they had some of their belongings in a second bedroom. Lupinacci removed the door of one of the empty bedrooms, referred to as bedroom # 3, and boarded up the other, hoping to discourage trespassers. Lupinacci told Frederick and Carrington that they could use all of Unit A's rooms until Lupinacci found new tenants to occupy them.

On the morning of February 19, 1993, Stamford Police Officers Carl Strate, Doug-

---

\* When judgment was entered, Judge Cabranes was Chief Judge of the District of Connecticut. He became a judge of the United States Court of Appeals for the Second Circuit in September 1994.

las Robinson, and Wayne Macuirzynski and Sergeant James Delano made a routine visit to 26 Garden. They knocked and announced themselves, and when Carrington opened the door, which led to Unit A's kitchen area, they entered. Upon entering the kitchen, they noticed Elliott and a woman, Michelle Porter, sleeping on a mattress on the floor of the doorless, and otherwise empty, bedroom # 3. Strate and Robinson entered bedroom # 3, awakened Elliott, identified themselves as police officers, and began questioning him. They noticed a small waist pouch located next to the mattress and discovered in it three rounds of ammunition. When Elliott sat up, they also spied a small handgun, which proved to be loaded, on the mattress. After giving his name as Terrence Wells, Elliott was arrested on state charges of trespass and possession of a weapon without a permit. While Elliott was being prosecuted on the state charges, the police learned his true identity and his prior criminal record, which included convictions in 1968 for rape, in 1974 for first-degree assault and second-degree kidnaping, and in 1976 for attempted murder. Based on that criminal history, the matter was transferred to federal authorities for prosecution of Elliott as an armed career criminal.

After being indicted by a federal grand jury on one count of possessing, as a prior felon, a firearm, in violation of 18 U.S.C. § 922(g)(1), Elliott moved to suppress the weapon and ammunition seized from him and statements he had made, arguing principally that the officers had had no authority to enter Unit A or bedroom # 3 and hence had violated his Fourth Amendment rights. The government opposed the motion, arguing, *inter alia*, that Elliott had no standing to challenge the officers' entry because he was a trespasser, and that, in any event, Lupinacci and Carrington had consented to the entry. A suppression hearing was held at which the district court heard testimony from seven witnesses—three of the Stamford police officers present at Elliott's arrest, plus Lupinacci, Frederick, Carrington, and the Director of Housing Code Enforcement ("Housing Code Director") for the City of Stamford ("City").

Officers Strate, Robinson, and Macuirzynski gave substantially similar testimony, in part describing the history of their patrols of 26 Garden at the behest of Lupinacci as set out in the preceding section, and describing the events of February 19, 1993. They stated that their understanding was that 26 Garden was run as a rooming house, with tenants in each unit renting individual rooms and sharing the kitchen and bathroom; Strate testified that "[Lupinacci] told us ... that the rooms in the past have always been rented out as dwellings, each person would have a room." (Hearing Transcript, July 28, 1993 ("Tr."), 55.) The officers testified that they had customarily entered the units of 26 Garden, either without objection from tenants who answered the door or by using the keys Lupinacci had given them.

As to the events of February 19, the officers testified, *inter alia*, that Carrington had told them that Porter was his guest, but he had claimed not to know Elliott or Elliott's name. Porter had roused herself and entered the kitchen area, where she told the police that she also did not know Elliott. Macuirzynski testified that Porter was arrested for trespassing even though Carrington said she was his guest, because she was occupying a room other than the one Macuirzynski believed Carrington was entitled to occupy.

The Housing Code Director testified that 26 Garden was licensed to be operated as an apartment house, with four units. He testified that "[s]ome years ago there was a question as to whether [26 Garden] was a rooming house or an apartment house" (Tr. 123), and that the building's owner was instructed "to use the house as an apartment house, having a maximum of four individuals ... in each apartment" (Tr. 124). He testified that if a building were being operated in violation of its license, and if the owner refused to comply with an enforcement order by the City, the City would hale the owner into court. He did not indicate that Lupinacci had ever been sued by the City. The Housing Code Director did not know how 26 Garden was in fact being run in February 1993.

Lupinacci testified that in early February 1993, after the previous roomers had left, he

had rented one of the bedrooms to Frederick, who was the official "tenant" of that bedroom, along with her boyfriend Carrington. He told Frederick and Carrington that they could "use the entire area, until such time when and if I moved somebody else into one of the other rooms." (Tr. 146.) Lupinacci testified, however, that

I hadn't given the police any written notification [of this arrangement]. I don't know whether I mentioned it to one of the officers or not.

But the problem was periodically the police would ask me for the list of tenants, and I would give them the list of the tenants, but I told them that there were [sic] such constant changeover in tenants that it was impossible to keep the police informed of who was in there legally.

And in this particular case, of course, it was sort of a changeover from a rooming situation to an apartment situation, and the police probably were not aware of that. It was just, it was impossible to keep them informed of changes. I was changing things so fast. . . .

(Tr. 147–48.) Lupinacci acknowledged that he had never been licensed to rent individual bedrooms as separate dwelling units.

Carrington testified that when the police knocked on February 19, he opened the door and the police greeted him and entered the kitchen area. They did not ask his permission to enter; he did not invite them in; but he did not object to their entering. Carrington had been told by Lupinacci that the police had keys; and the police had come to inspect several times since Frederick and Carrington moved into 26 Garden. Carrington believed the officers had the right to enter. Carrington testified that, from the kitchen, the officers had seen Elliott lying in the doorless bedroom # 3.

Carrington testified that when the officers stated that Elliott and Porter were being arrested for trespassing, Carrington, who had not theretofore said anything about who Elliott was, "spoke up and I told them they're not trespassing, they are guests of Sharil and mine." (Tr. 161.) Frederick testified that she informed the police that Elliott was her brother, that Porter was his girl-friend, and that Frederick had allowed them to spend the night in bedroom # 3.

## C. *The District Court's Ruling*

In a Ruling on Defendant's Motion To Suppress dated September 9, 1993 ("Ruling"), the district court denied Elliott's motion to suppress. Though the court found that Elliott had standing to raise his Fourth Amendment claim because Frederick had been authorized by Lupinacci to use bedroom # 3 and Elliott was her guest, *see Minnesota v. Olson*, 495 U.S. 91, 99–100, 110 S.Ct. 1684, 1689–90, 109 L.Ed.2d 85 (1990) (overnight guest has a reasonable expectation of privacy in his host's home), and though it found that Carrington had not explicitly or implicitly consented to the officers' entry because "[a]ll of the participants were operating under the common assumption that Carrington's consent was simply irrelevant," Ruling at 18, the court found, relying primarily on *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), that the entry did not violate the Fourth Amendment because the officers reasonably believed that Lupinacci had given valid consent to their entry.

The district court found that though 26 Garden was not licensed for use as such, it had been operated for years as a kind of rooming house, and that until just prior to February 19, 1993, Lupinacci had retained control of the common areas of the building, including the kitchen and the common entry into the kitchen area. While noting that Lupinacci had testified that by February 19, the building was undergoing "a sort of changeover from a rooming situation to an apartment situation," Ruling at 3–4 (internal quotes omitted), the court found that "Lupinacci never informed the police that the use of the building had changed and that Frederick[ ] and Carrington had been afforded exclusive use and access to the entire first floor right dwelling unit," *id.* at 4. The court found that prior to February 19, "the officers had established a pattern of regular, unannounced entries into the building that were not predicated on the specific prior consent of either the tenants or Lupinacci," *id.* at 21, and that, "[i]nsofar as the police officers were aware, at the time the building was being

used as a rooming house, Lupinacci had the authority to consent to their entry into the common areas," *id.* at 20. The court upheld the search on the basis that the officers believed that Lupinacci's consent was valid and unrevoked on the date of Elliott's arrest and that that belief was reasonable.

The district court rejected Elliott's contention that Lupinacci lacked the authority to consent because the building was not licensed as a rooming house under Connecticut law, and landlords generally lack authority to consent to a search of a leased apartment on the tenant's behalf. The court stated that

> whether Lupinacci could consent to a search depends upon whether he had "common authority" over the property for purposes of federal constitutional law.... [E]ven assuming that Lupinacci did not, in fact, have the authority to consent to a search because the building was not licensed as a rooming house under state or local law, it is clear that the officers' belief that he possessed such authority was, nonetheless, reasonable since they had no reason to know, or to even suspect, that the building was not a valid rooming house. Lupinacci clearly represented to the officers that the building was a rooming house and, indeed, it was so used from as early as 1989 to February 1993. To find unreasonable the officers' belief that the building was a rooming house under the circumstances presented here would be, in effect, to require them to independently verify the zoning and housing regulations applicable to Lupinacci's building. Surely this is not the kind of conduct on the part of police officers that is mandated by the "reasonableness" requirement of the Fourth Amendment.

*Id.* at 20–21 n. 18. The district court concluded that "[t]here were simply no facts that would have put the officers on notice or led them to inquire as to the continuing validity of Lupinacci's standing consent to enter and search the common areas of the building." *Id.* at 22.

Following the denial of his suppression motion, Elliott, with the permission of the court, entered his conditional plea of guilty, reserving the right to challenge that denial on appeal.

## II.  DISCUSSION

On appeal, Elliott pursues his Fourth Amendment challenge to the officers' entry into and search of bedroom # 3, contending that the district court misapplied *Illinois v. Rodriguez.* The government argues that the district court's application of that case, in light of its factual findings, was not erroneous; and it contends that the court could also have properly denied the suppression motion by finding that Lupinacci or Carrington validly consented to the officers' entry into 26 Garden, or that Elliott had no reasonable expectation of privacy when he was sleeping on a bare mattress in a doorless room visible from the unit's common kitchen. We conclude that even if there was no valid consent, in the circumstances found by the district court the officers' entry was reasonable under Fourth Amendment standards.

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless search is " '*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions.' " *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). One such exception is that a warrantless entry and search are permissible if the authorities have obtained the voluntary consent of a person authorized to grant such consent. *See generally Schneckloth v. Bustamonte,* 412 U.S. at 222, 93 S.Ct. at 2045. Consent may validly be granted by the individual whose property is to be searched, *see id.,* or by a third party who possesses common authority over the premises, *see United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).

The question with respect to a third-party authorization is whether the third party possessed "a sufficient relationship to the searched premises to validate the search." *United States v. Trzaska,* 859 F.2d

1118, 1120 (2d Cir.1988), *cert. denied,* 493 U.S. 839, 110 S.Ct. 123, 107 L.Ed.2d 84 (1989). Under *Matlock,* a third party may validly grant the requisite consent if he has joint access or control of the property for most purposes. *Id.,* 415 U.S. at 171 n. 7, 94 S.Ct. 993 n. 7. Under *Illinois v. Rodriguez,* even if the third party did not have the requisite relationship to the premises, and therefore lacked the authority to give a valid consent, official reliance on his consent may validate the search if it was reasonable for the officers to believe he had the requisite relationship. *See* 497 U.S. at 179, 110 S.Ct. at 2796. Similarly, if the search exceeded the scope of the consent given, an officer's objectively reasonable belief that the search was within the scope of that consent is sufficient to validate the search. *See Florida v. Jimeno,* 500 U.S. 248, 249, 111 S.Ct. 1801, 1802, 114 L.Ed.2d 297 (1991). *Rodriguez,* however, validates only searches that are based on a reasonable mistake as to the facts, not those based on an erroneous legal conclusion drawn from the known facts. *See United States v. Brown,* 961 F.2d 1039, 1041 (2d Cir.1992) (per curiam); *United States v. Salinas–Cano,* 959 F.2d 861, 865–66 (10th Cir.1992); *United States v. Whitfield,* 939 F.2d 1071, 1073–75 (D.C.Cir.1991).

█ In general, a landlord does not have common authority over an apartment or other dwelling unit leased to a tenant. *See, e.g., Chapman v. United States,* 365 U.S. 610, 616–18, 81 S.Ct. 776, 779–81, 5 L.Ed.2d 828 (1961). Thus, an officer's erroneous belief that landlords are "generally authorized to consent to a search of a tenant's premises" would not provide the authorization necessary for a warrantless search. *United States v. Brown,* 961 F.2d at 1041 (landlady's limited authority to enter the apartment to turn off electrical appliances or lights did not give her blanket authority to enter or consent to search).

A landlord does, however, have authority to consent to a search by police of dwelling units in his building that are not leased. *See United States v. Williams,* 523 F.2d 64, 66 (8th Cir.1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976). Further, if the landlord has joint access or control over

certain areas of his apartment building for most purposes, he may validly consent to a search of those areas. *See, e.g., United States v. Kellerman,* 431 F.2d 319, 324 (2d Cir.) (landlord of apartment building could validly consent to search of basement area, used by all tenants, which was under general control of landlord), *cert. denied,* 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970); *United States v. Kelly,* 551 F.2d 760, 764 (8th Cir.) (even assuming that tenant had reasonable expectation of privacy in common hallways of apartment building, landlord with joint access or control could consent to search), *cert. denied,* 433 U.S. 912, 97 S.Ct. 2981, 53 L.Ed.2d 1097 (1977). *See also United States v. Warner,* 843 F.2d 401, 403 (9th Cir.1988) (consent valid if tenant not present and "landlord had an equal right of access to the premises").

In the present case, the district court found that because Lupinacci had authorized Frederick and Carrington to use all of Unit A,

> there was no "common area" at 26 Garden Street over which Lupinacci exercised "common authority," or to which Lupinacci had joint access, with Frederick[ ] and Carrington. Lupinacci's long-standing consent to search that location had simply been overtaken by events prior to February 19, 1993. That consent was, in effect, "stale" at the time the police conducted their search on that date and, thus, cannot support the warrantless search in these circumstances.

Ruling at 16. The court concluded, however, that the officers' belief that Lupinacci had the power to consent and that he had not revoked that consent was reasonable and hence validated their entry and search. Elliott contends that this ruling misapplied the above principles, arguing that (a) since 26 Garden was not licensed to be operated as a rooming house, the officers' belief that Lupinacci had the authority to authorize entry and search of Unit A was an error of law, (b) even if it was a mistake of fact, it was not a reasonable mistake, and (c) the search of bedroom # 3 went beyond the scope of any consent the officers had or reasonably be-

lieved they had. We reject all of these contentions.

■ First, we reject Elliott's contention that the officers' belief that 26 Garden was permissibly operated as a rooming house was a mistake of law. The officers would have committed a mistake of law had they drawn an erroneous conclusion about the scope of Lupinacci's authority based on the facts known to them. *See United States v. Brown*, ·961 F.2d at 1041. Yet Lupinacci had represented 26 Garden as a rooming house in which he retained authority over common areas and unleased rooms. The officers correctly concluded as a matter of law that Lupinacci's representations, if true, authorized their entry into common areas and unleased rooms. The officers simply committed a mistake of fact because, unbeknownst to them, Lupinacci did not actually possess a license to operate 26 Garden as a rooming house.

■ We also reject Elliott's contention that the officers' mistaken belief that 26 Garden was permissibly being operated as a rooming house was not a reasonable mistake. 26 Garden had in fact been operated for years as a rooming house. Though the City's Housing Code Director testified that Lupinacci had been instructed to operate the building as an apartment house some years earlier, there is no indication in the record that he had ever been sued by the City on account of his actual practices, and hence no basis for inferring that the police should have known that its actual operation as a rooming house was unlicensed.

■ Similarly, we reject Elliott's contention that the search of Unit A or bedroom # 3 should be invalidated on the basis of the district court's finding that on February 19, 1993, Unit A was actually being operated as a single apartment rather than four separate dwelling units. As discussed above, the owner of a building that has unleased dwelling units has the right to authorize the police to search the unleased units. Whether or not a given unit is unleased, however, is a question of fact. Any error of the officers with respect to Lupinacci's authority to consent to their entry into and search of the common kitchen of Unit A and bedroom # 3 was a mistake of fact since it turned on what arrangements Lupinacci and Frederick had made with respect to those areas. The error resulted from the officers' ignorance of the actual arrangements made between Lupinacci and Frederick with respect to these areas, not on an erroneous legal conclusion drawn from the facts the officers reasonably believed to be true. We agree with the district court that officers, having for years been given authority by Lupinacci to enter the common areas and vacant bedrooms of 26 Garden in order to arrest trespassers and persons carrying on illegal activity, had no basis on which to suspect that on February 19, 1993, Lupinacci could not validly authorize their entry into either Unit A or bedroom # 3. Lupinacci testified that Frederick and Carrington were "tenant[s]" only of bedroom # 1. Though Lupinacci testified that he had given Frederick and Carrington permission to use the unleased parts of Unit A (until he moved someone else into those bedrooms), he also testified that he had not so informed the police. Thus, the police had no reason to know of any change in the operation of the building from rooming house to apartment house, and they reasonably believed their authorization to enter the common kitchen area and the bedrooms not listed as leased remained intact. And so far as they had been informed, bedroom # 3 remained unleased and was therefore within the actual and permissible scope of Lupinacci's consent for inspection.

In sum, we conclude that even if Lupinacci lacked authority to authorize the officers to enter Unit A of 26 Garden and search bedroom # 3, the officers reasonably believed they had such authority, and that the district court therefore properly denied Elliott's motion to suppress the evidence seized as a result of that entry and search.

## CONCLUSION

We have considered all of Elliott's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.

MINER, Circuit Judge dissenting:

Because I am of the opinion that the police officers who entered the bedroom where appellant was sleeping lacked the requisite objectively reasonable belief that the landlord could give them permission to be there, I respectfully dissent.

The district court found that the landlord did not have common authority over, or joint access to, any common areas of the premises at the time of the police entry. According to the district court, the consent previously given by the landlord was "stale" by the time of the entry because of the change in the configuration of the dwelling units from a single room occupancy set-up to apartment units encompassing the former single room units. However, the district court determined that it was reasonable for the police to operate under the consent given for the search of the common areas of the building as they existed before the reincarnation of the structure as an apartment dwelling. On the basis of that consent, the district court noted that "the officers had established a pattern of regular, unannounced entries into the building that were not predicated on the specific prior consent of either the tenants or [the landlord]."

In *Illinois v. Rodriguez,* 497 U.S. 177, 179, 110 S.Ct. 2793, 2796, 111 L.Ed.2d 148 (1990), the Supreme Court answered the following question in the affirmative:

Whether a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not do so.

Applying *Illinois v. Rodriguez,* we have determined that it is not reasonable for police to believe that a landlord who enters an apartment for the purpose of switching off electrical appliances from time to time has common authority with the tenant over the leased premises. *United States v. Brown,* 961 F.2d 1039, 1041 (2d Cir.1992) (per curiam).

A landlord of an apartment building may give a valid consent to search a commonly used basement, *United States v. Kellerman,* 431 F.2d 319, 321, 324 (2d Cir.), *cert. denied,* 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970), or a common hallway, *United States v. Kelly,* 551 F.2d 760, 764 (8th Cir.), *cert. denied,* 433 U.S. 912, 97 S.Ct. 2981, 53 L.Ed.2d 1097 (1977), where the landlord has joint access or control. As to such areas, it is eminently reasonable for police officers to believe that the landlord possesses authority to confer upon them the consent to enter. The general rule, of course, is that a landlord does not possess common authority with his tenant over an apartment or other dwelling unit, *see Chapman v. United States,* 365 U.S. 610, 616–18, 81 S.Ct. 776, 779–81, 5 L.Ed.2d 828 (1961), and a police officer who acts without some verification to support his belief that the landlord possesses such authority does not act reasonably.

In view of the foregoing, it is of little consequence that the premises occupied by the appellant were perceived by the police to be under single-room occupancy. The police entered from the outside of the building directly into a kitchen formerly utilized by the single-room tenants. They made this entry under the purported authority of a landlord who gave them an open-ended license to enter his building, apparently at any time of the day or night. On the basis of this unrestricted third-party consent, which apparently also was without temporal limitations, the police regularly entered the building and proceeded directly into the living areas without announcing their authority to enter and without obtaining specific prior consent from the landlord or the occupants. The entry of the police from the outside into the kitchen in this instance enabled them to see from the kitchen into the bedroom where appellant was sleeping, the landlord previously having removed the door to the bedroom. The police then awakened appellant and began to question him. This was the first knowledge that appellant had that the police were present in the building.

Assuming as we must that the single-room occupancy configuration still prevailed and that the kitchen through which the police entered was available for the use of all the single room occupants on the first floor, it cannot be said that the kitchen was a place

where the landlord exercised joint access or control. There certainly was nothing in the record to demonstrate the landlord's authority over that area, other than the fact that he purported to confer upon the police a general warrant to enter the building. A kitchen may be a common area for the use of tenants without being under the joint control of the landlord. Under the government's theory, the landlord could grant the police access to locked bathrooms shared by the single room tenants on the first floor of the building. The landlord provided the kitchen and the bathrooms for the use of the tenants residing there but did not retain the type of joint control that he might have retained in the case of a basement or a hallway.

It seems to me unreasonable for a police officer to assume that, merely because the landlord gives him a key, he can barge into a living area, albeit one shared by other tenants. A warrantless search is an exception, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973), and the police should start out with that principle in mind. When the police receive a landlord's consent to enter an apartment or a living area shared with other tenants, they should be under a duty to inquire regarding the authority of the landlord. Under the circumstances of this case, I just do not believe that the police acted under a reasonable belief of proper consent when they proceeded into the kitchen and then into the bedroom of this dwelling house. The police should not be encouraged to rely upon an open-ended, non-specific consent given by a landlord with dubious authority to authorize an invasion of the type described here.