[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff is the owner of a multi-family apartment building located at 169 Madison Street, Hartford. The defendant City of Hartford, Director of Health (Hartford) on March 5, 1996, issued an order requiring the abatement of lead in an apartment of 169 Madison Street, Hartford. The plaintiff appealed such order to the defendant State of Connecticut, Department of Public Health (DPH) pursuant to General Statutes § 19a-229.[1] The DPH held hearings on the plaintiff's appeal on May 14, June 27 and August 7, 1996, at which the plaintiff appeared with legal counsel. Hartford also participated in the hearings before the DPH hearing officer, Steven J. Varga, Esq., who issued a recommended decision on February 10, 1997 denying the plaintiff any relief. The plaintiff and Hartford were advised of their rights pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes §§ 4-166 et seq. and 4-179 to file exceptions and argument to the recommended decision. The plaintiff on March 5, 1997 filed exceptions and requested oral argument. On March 25, 1997, oral argument was heard by Hearing Officer Antonia Howard. On April 11, 1997, a final decision was issued adopting the recommended decision and dismissing the plaintiff's appeal.
The plaintiff filed this appeal under the provisions of § 4-183 of the UAPA on May 7, 1997. The DPH moved unsuccessfully to dismiss the appeal. The answer and record were filed on November 17, 1997. Briefs were filed by the plaintiff on January 21, 1998, Hartford on April 1, 1998 and the DPH on April 2, 1998. The parties were heard in oral argument on June 9, 1998.
The lead abatement order, which the plaintiff challenges, was issued pursuant to the State Public Health CT Page 11029 Code. Section 19a-111 of the General Statutes requires epidemiological investigations by the local director of health whenever there is a report of an elevated blood level equal to or greater than twenty micrograms per deciliter of blood. General Statutes § 19a-111. The law authorizes the health director to order remedial action by persons responsible for the condition.
Section 19a-111c of the General Statutes also imposes burdens on any owner of a dwelling with toxic levels of lead in which children under the age of six reside.
The facts underlying this appeal are as found in the memorandum of recommended decision, which was adopted as the agency final decision. A review of the record undertaken by the court finds substantial evidence exists for such findings of fact.
 1. The Appellant is the owner of the multi-family building located at 169 Madison Street, Hartford. (Transcript 6/27/96 p. 48).
 2. On February 26, 1996, a child born March 20, 1993 and residing at said address was tested and found to have a blood lead level of 28 micrograms per deciliter (hereinafter ug/dl). This was greater than 20 ug/dl and therefore constituted an elevated blood lead level under § 19-111-1(bb) of the Regulations. (Exhibit A).
 3. On March 4, 1996, the Hartford Health Department received verbal notification of this finding. (Exhibit 3).
 4. The Health Department received a facsimile copy of the lead testing report on March 6, 1996. (Exhibit A).
 5. On March 4, 1996, an inspector for the Health Department conducted an epidemiological investigation which disclosed that the child at issue resided in the Second Floor apartment of 169 Madison Street, and had lived there since March 1, 1995. (Exhibits 3 and 14). CT Page 11030
 6. A lead inspection of this apartment and common areas was conducted on March 4 and 5, 1996. (Exhibit 1).
 7. The Health Department tested tap water at the apartment for the presence of lead, and found only a trace of lead in the water. (Transcript 8/7/96 p. 65, Exhibit 1).
 8. The soil was not tested because the ground was covered with snow. (Exhibit 14).
 9. The investigation disclosed that the child had a practice of putting paint chips and painted toys in his/her mouth. (Transcript 8/7/96 p. 59).
 10. There is no evidence that the painted toys were tested to determine whether they contained toxic levels of lead.
 11. The Health Department also made a preliminary lead investigation of the child's grandmother's house, but concluded that the child was not poisoned there. (Transcript 8/7/96 pp. 63-64).
 12. The Health Department inspectors who conducted the investigation and inspection do not have any present recollection of the specifics of this case. (Transcript 6/27/96 p. 26 and Transcript 8/7/96 p. 34).
 13. The customary inspection procedure followed by the Health Department's inspectors is for the tenant to be advised that a child has been diagnosed with an elevated blood lead level, and that there is a need to conduct an epidemiological investigation and an environmental inspection. (Transcript 6/27/96 p. 25).
 14. Once the child's residency has been established, it is part of the protocol to inform the tenant that they need to conduct an inspection of each room, and request permission for this inspection. (Transcript 6/27/96 pp. 27-28). CT Page 11031
 15. If an inspector is denied access to an apartment, they leave their business card and refer the case to their supervisor for appropriate action. (Transcript 6/27/96 p. 37).
 16. If an inspector is requested to leave an apartment after an environmental inspection has started, they honor the request and leave the apartment. (Transcript 6/27/96 p. 39).
 17. There is no evidence in the record that the tenants of the subject apartment objected to either the epidemiological investigation or the environmental inspection.
 18. The Appellant did not given the Health Department authorization to perform the inspection. (Transcript 6/17/96 p. 48).
 19. The lead inspection disclosed that in a number of areas of the apartment, including parts of the windows, the lower walls in the bathroom, and the first floor porch, there were defective surfaces with toxic levels of lead as defined in § 19a-111-3
(a)(2) of the Regulations. (Exhibit 1).
 20. The Department of Health issued an Order on March 5, 1996, requiring the abatement of the lead in the apartment. The Order was received by the Appellant on March 14, 1996.
 21. Prior to receiving the Order, the Appellant had been informed of the investigation by the tenant and met with Owen Humphries, Coordinator for the Lead Poison Prevention and Education Program for the Health Department to discuss the findings at the apartment, and their ramifications for her. (Transcript 6/27/96 p. 57).
 22. This session was terminated by the Appellant. (Transcript 6/27/96 p. 117).
 23. The Appellant contacted the Connecticut Historical Commission pursuant to § 19a-111-3(g) of the Regulations. (Transcript 6/27/96 pp. 64-68). CT Page 11032
 24. The Appellant received some information from the Connecticut Historical Commission, but not the detail that she desired, and she sent a subsequent letter on May 6, 1996. (Exhibit 6).
 25. As of June 26, 1996, the Appellant had not received the detailed information that she requested. (Transcript 6/27/96 p. 68).
 26. The child in question and his/her family no longer reside in the subject dwelling. (Transcript 6/27/96 p. 94).
 27. The record does not definitively establish when they vacated, but a record maintained by the Health Department indicates that a Vacate Notice was forwarded to Katherine McCormack, Director of Health, for her signature on March 8, 1996. (Exhibit 3).
(Footnotes omitted.) (Return of Record (ROR), Vol. I, Memorandum of Recommended Decision, pp. 8-12.)
The plaintiff raises a number of issues relating to the procedural process used in the epidemiological investigation. The plaintiff's first claim, that the statutorily mandated investigation can not be initiated on the basis of an oral or facsimile transmitted report, is not indicated by either the language or purpose of § 19a-111. The statutory language merely references report without the qualifying terms the plaintiff seeks this court to add. It is a basic rule of statutory construction that the role of the court is not to add to or amend the plain meaning of a statute. See Leo Fedus Sons Construction Co. v. ZoningBoard of Appeals, 225 Conn. 432, 441-42 (1993).
The statutory language mandating the local director of health provides: "Upon receipt of each report . . . the local director of health shall make or cause to be made an epidemiological investigation." General Statutes § 19a-111. The language of the statute certainly does not prohibit a response to oral reports and may in fact require such responses. The statute speaks to preventing further exposure to poisoning and relocation of occupants. The CT Page 11033 clear public policy would hardly be served by the court manufacturing formalistic obstacles to such health related investigations.
Section 19a-111-3 (c)(1) of the Regulations of Connecticut State Agencies requires the investigation begin within 5 working days "after notification" and calls for its completion as "expeditiously as possible." Notification under the regulation would include the oral notification which launched this investigation.
The plaintiff next challenges the lead inspection performed by the health department on the grounds that it was illegal, improper and performed without a search warrant. The plaintiff correctly notes that inspections by municipal health and safety inspectors implicate Fourth Amendment rights. The leading case which recognized this principal also acknowledged that no warrant was necessary if consent to a search was obtained. Camara v. Municipal Courtof San Francisco, 387 U.S. 523, 87 S.Ct. 1727,18 L.Ed.2d 930 (1967).
The "totality of the circumstances" test of consent articulated in Schneckloth v. Bustamonte, 412 U.S. 218,93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) and adopted in State v.Reagan, 209 Conn. 1, 7 (1988) is satisfied by the evidence of the inspector's usual procedure, and the total absence of any evidence of a lack of consent by the tenants, or of coercion by the inspectors. It is also difficult to imagine why the tenants whose child was suffering from lead poisoning would not cooperate with a health investigation. The tenants as a matter of law had the control of the apartment sufficient to consent to the search. Rakas v.Illinois, 439 U.S. 128, 144, 99 S.Ct. 421, 58 L.Ed.2d 387
(1978); Chaipman v. United States, 365 U.S. 610, 616-17,81 S.Ct. 776, 5 L.Ed.2d 828 (1911); United States v. Elliot,50 F.3d 180 (2d Cir. 1995); State v. Zindros, 189 Conn. 228,246-47 (1983).
The plaintiff's challenge to the evidence relating to the investigation issue is controlled by the substantial evidence rule.
"Judicial review of an administrative agency decision requires a court to determine whether there is substantial CT Page 11034 evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact." (Citations omitted; internal quotation marks omitted.)Dolgner v. Alander, 237 Conn. 272, 280 (1996).
"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. General Statutes § 4-183(j)(5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . ." (Citations omitted; footnote omitted, internal quotation marks omitted.)Dolgner v. Alander, supra, 237 Conn. 281. Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . ." (Citations omitted; internal quotation marks omitted.) Id.
The finding relating to this issue are supported by substantial evidence in the record, as noted in the findings of fact in the memorandum of recommended decision.
The plaintiff argues that the inspectors used an x-ray like device to inspect the walls for toxic levels of lead, and thus searched areas not within the tenant's control. The court agrees with the hearing officer's conclusions of fact and law that the plaintiff failed to establish a legitimate expectation of privacy in the paint on the walls of a rented apartment. The search in the present case is analogous to the dog sniff for marijuana, which was found not to constitute a search under the Fourth Amendment.Rakas v. Illinois, supra, 439 U.S. 143; United States v.Jacobsen, 466 U.S. 109, 123, 104 S.Ct. 1652,80 L.Ed.2d 85 (1984). The United States Supreme Court found no CT Page 11035 legitimate privacy interest in the contraband and noted the minimally intrusive nature of the search. Similarly, in the present case, there is no legitimate privacy interest in a toxic level of lead paint on the walls of an apartment rented to the public. United States v. Place, 462 U.S. 696,707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).
The plaintiff's challenge to the facial validity of the abatement order fails when the order is reviewed. (ROR, Vol. III, pp. 58-65.) The plaintiff who was in contact with the Hartford Health Department failed to show how the alleged illegibility of her copy of the order prejudiced her substantial rights. See General Statutes § 4-183 (j).
The plaintiff challenges the validity of the epidemiological investigation because of its limited scope. Hartford by regulation was mandated to commence the investigation and complete it expeditiously. The inspections tested the tap water at the residence (ROR, Vol. I, Memorandum of Recommended Decision, p. 9, ¶ 7); investigated the child's grandmother's home (ROR, Vol. I, Memorandum of Recommended Decision, p. 10, ¶ 11), in addition to testing the defective surfaces in the child's apartment (ROR, Vol I, Memorandum of Recommended Decision, p. 11, ¶ 19). The soil in the yard was not tested as the ground was covered with snow. (ROR, Vol. I, Memorandum of Recommended Decision, p. 9, ¶ 8.) There was no evidence that the toys were ever tested for lead levels. (ROR, Vol. I, Memorandum of Recommended Decision, p. 10, ¶ 10.) The inspectors also learned that the child put paint chips and painted toys in his mouth. (ROR, Vol. I, Recommended Decision, p. 9, ¶ 9.) The tap water contained only a trace of lead and the grandmother's home was eliminated as a source of lead poisoning. (ROR, Vol. I, Memorandum of Recommended Decision, p. 9, ¶ 7; p. 10, ¶ 11.)
Section 19a-111 provides in pertinent part: "Upon receipt of each report of confirmed venous blood level equal to or greater than twenty micrograms per deciliter of blood, the local director of health shall make or cause to be made an epidemiological investigation of the source of the lead causing the increased lead level or abnormal body burden and shall order action to be taken by the appropriate person or persons responsible for the condition or conditions which brought about such lead poisoning as may be necessary to CT Page 11036 prevent further exposure of persons to such poisoning."
It was a reasonable conclusion for the agency to determine that the lead paint in plaintiff's apartment was the "source of the lead causing the increased blood lead."
The agency action was also mandated by § 19a-111c.[2]
The child was reasonably found to have resided at the plaintiff's property. There is no causation requirement under § 19a-111c. Nadeau v. Commissioner of Public Health, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 553046 (March 15, 1996) (Maloney, J.).
Plaintiff also alleges violations of constitutional rights to due process of law. These claims relate to evidence concerning the child's medical condition (blood level) and other potential sources of lead poisoning.
The hearing officer's alleged errors in precluding the introduction of evidence of other sources of poisoning were not material. The proffers indicated that the evidence would be not specific to this investigation.
Pursuant to § 19a-111c it did not matter whether the child (born March 20, 1993, thus under the age of six) had an elevated lead level. On the date of the order, March 5, 1996, he was a resident of the apartment under the age of six, thus abatement was mandated by law.
The plaintiff cites Silver v. Commissioner of MotorVehicles, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 562503 (January 23, 1997, Maloney, J.) (18 CONN. L. RPTR. 497) for the proposition that the DPH should have produced the authors of the lead level report. However, that case involved a scenario where the plaintiff had subpoenaed the witnesses, who failed to appear. There is no evidence that the plaintiff in the present case subpoenaed the medical personnel who she wished to have examined. This failure would constitute a waiver of such claims under Drogan v. Connecticut Medical ExaminingBoard, 223 Conn. 618 (1992).
At the time of the hearing, the apartment was vacated. The regulations of the DPH, however, indicated that the abatement orders have a prospective application. See Regs. CT Page 11037 Conn. State Agencies § 19a-111-2 (a); Nadeau v. Commissioner,supra, Superior Court, Docket No. 553046; contra, Campbellv. Six Fifth Avenue Corp. , Superior Court, judicial district of Danbury, Docket No. 956978 (July 3, 1996, Mihalakos, J.) (17 Conn. L. Rptr. 274). Section 19a-111 specifically states that abatement orders are "to prevent further exposure of persons to lead poisoning. . ." Clearly, such language is not consistent with vacating abatement orders issued when the former subjects of toxic levels have left the premises.
The appeal is dismissed.
Robert F. McWeeny, J.