UNITED STATES of America,

v.

Maria Gladys BUITRAGO PELAEZ and Madeline Duran, Defendants.

No. 96 Cr. 464(JSR).

United States District Court, S.D. New York.

April 11, 1997.

Mary Jo White, U.S. Attorney by Bart Vandewegh, Asst. U.S. Atty., White Plains, NY, for Government.

David Zapp, Leonia, NJ, for Maria Gladys Buitrago Pelaez.

Faith Colangelo, Dobbs Ferry, NY, for Madeline Duran.

### MEMORANDUM ORDER

RAKOFF, District Judge.

Defendants Buitrago and Duran—indicted in connection with an alleged money laundering conspiracy—have moved to suppress evidence seized during the October 2, 1995 warrantless search of Tropical Travel, Inc., a business in Queens, NY. After reviewing the motion papers and hearing oral argument on the law, the Court held a lengthy evidentiary hearing, occupying portions of four days over the span of two months, at which most of the persons present during the search testified. During the same period, the Court also re-ceived supplemental papers from the parties as well as a videotape of the search made by a surveillance camera maintained on the premises of Tropical Travel. At the conclusion of the suppression hearing on February 21, 1997, the parties requested the opportunity to submit further briefs. Although informed that the case was to be re-assigned on March 1, 1997 to the Honorable Barbara S. Jones, U.S.D.J., the parties further requested that this judge retain jurisdiction of the suppression motion beyond that date in order to give them ample time to submit further papers and to give the judge who had seen and heard the witnesses the opportunity to rule on the motion. Judge Jones also consented to this procedure, and all time between February 21, 1997 and the decision of this motion was excluded from Speedy Trial calculations, pursuant to 18 U.S.C. § 3161. *See* Transcript of Suppression Hearing ("Tr.") at 622.

Having now received the final papers of the parties and the transcripts of the hearing, the Court, following a complete review of all evidence and argument, concludes that the suppression motion must be denied.

The relevant facts, as the Court finds them, are as follows:

On the morning of October 2, 1995, various agents of the Drug Enforcement Agency and of the Criminal Investigation Division of the Internal Revenue Service commenced surveillance of Tropical Travel as part of an ongoing investigation of alleged money laundering activities. The surveillance team consisted of DEA Agents Steven Monaco and Brian Connelly and IRS Special Agents Thomas Beers, Robert Miranda, Steven Ashcroft, and Phillip Kirschen. The surveillance was conducted from automobiles parked at various locations around Tropical Travel.

At around 5:35 p.m. two Hispanic males delivered a large, brown plastic bag to the premises and exited shortly thereafter without the bag. Based on prior information given to the agents (described *infra*), the agents had a reasonable basis for suspecting that the bag contained cash that was to be "laundered" by Tropical Travel. Tr. at 236–37.

Later that day, a male subsequently identified as Anthony Duran, brother of defendant Madeline Duran, entered the premises at Tropical Travel, where he joined the only two employees present, Ms. Duran and Ms. Luz Elsie Chacon. Tr. at 237. Unbeknownst to the surveilling agents, Anthony Duran was an officer of the New York City Police Department, who was assisting his sister in his off-duty hours. Suspicious of the cars parked around Tropical Travel (the premises had recently been robbed), Anthony Duran exited the premises around 7:00 p.m., approached the car in which DEA Agent Connelly was parked, and inquired what Connelly was doing. Receiving no direct response, Anthony Duran went back inside Tropical Travel. Tr. at 237–38.

Fearful that the surveillance operation had been compromised, Agent Connelly radioed the other surveilling agents and described the exchange that he had just had with Anthony Duran. The Government agents thereupon decided to enter Tropical Travel and conduct a search. Tr. at 238. Although the time was now 7:30 p.m. and a small sign at the front of Tropical Travel indicated that the store normally closed at 7:00 p.m., the lights were still on and people could be seen milling about inside. Finding the door unlocked, the agents entered the front or public-reception portion of the premises. Tr. at 516. Although Anthony Duran, who of the three persons already inside was closest to the glass door entrance, waved his arms in a manner that might have been interpreted to indicate that the business was closed, the agents continued inside and, after identifying themselves as federal agents, patted down Anthony Duran, removing a concealed .9 mm semi-automatic firearm. They then proceeded to a middle office area separated from the front area by a door and glass partition, where Madeline Duran and Elsie Chacon were located. Tr. at 240. After conducting a protective sweep of the middle area and of a small back office, adjacent to the middle area and separated from it by a door that was partly open, the agents began separately interrogating Chacon, defendant Duran, and Anthony Duran. Tr. at 240–41. The questioning revealed, *inter alia,* that the owner of Tropical Travel, defendant Buitrago, was away on vacation, but that both Chacon and Madeline Duran were employees of the business, while Anthony Duran was not.

Following further questioning, Chacon, who was seated in the middle area, was asked to sign a Spanish-language form consenting to a general search of the premises. After carefully reviewing the form and discussing it with Anthony Duran, she did so. Tr. at 136–38. Various records and other items were subsequently seized pursuant to this consent.

Meanwhile, however, agents questioning Madeline Duran in the back office had noticed a locked safe located in that room and had asked Ms. Duran to open it. Although defendant Duran exhibited some hesitancy and expressed difficulty in remembering the combination, she eventually opened the safe, which proved to contain more than $70,000 in cash (some in what appeared to be the same plastic bag delivered earlier that day by the two Hispanic males), plus various bank books and other records evidencing a likely money laundering operation. Tr. at 575–76.

Against this factual background, defendants challenge whether the agents lawfully entered Tropical Travel, whether they lawfully obtained a valid consent from Ms. Chacon to search the premises, and whether they lawfully obtained a valid consent from Ms. Duran to search the safe. In its final submission to the Court, dated March 10, 1997, the Government for the first time questioned whether defendants Buitrago and Duran had standing to raise these claims. But even assuming the Government had not already waived the objection (compare *United States v. Kinsey,* 843 F.2d 383, 390 (9th Cir.1988), *cert. denied,* 488 U.S. 836, 109 S.Ct. 99, 102 L.Ed.2d 75 (1988) (no waiver), with *United States v. Emery,* 541 F.2d 887, 889 n. 3 (1st Cir.1976) (waiver)), the objection must be rejected. While the thrust of the Government's argument on standing is that the cash and other items seized did not belong to Duran or even "to Buitrago either personally or as proceeds of her business," *see* 3/10/97 Govt.Mem., the technicalities of property law are not the key to the determination of Fourth Amendment standing. *See*

.*Mancusi v. DeForte,* 392 U.S. 364, 368–69, 88 S.Ct. 2120, 2123–24, 20 L.Ed.2d 1154 (1968). Instead, whether a person possesses standing to object to a search turns on whether that person has a "reasonable expectation of freedom from governmental intrusion" in the areas searched and the items seized. *See Katz v. United States,* 389 U.S. 347, 352, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967). Both Buitrago, as owner of the premises on which the safe was kept, and Duran, as the employee whom Buitrago entrusted with the combination to the safe, had a reasonable expectation of privacy as to the contents of a locked safe to which they controlled access. *See Mancusi,* 392 U.S. at 368–69, 88 S.Ct. at 2123–24 (union official had standing to object to search and seizure of union records from an office shared with other union officials, where the official had custody of the records at the time and reasonably expected that the records would not be touched except with permission of other union officials). Moreover, Buitrago as owner, and Duran as a supervisory employee, had a reasonable expectation of freedom from unwarranted government intrusion into the premises of Tropical Travel generally. *Id.*

■ While defendants Buitrago and Duran thus have standing to object to the search of Tropical Travel and the safe, their objections prove, in the end, unavailing. With respect to the initial entry, there were sufficient objective indications that the publicly accessible portions of the premises were still open as to warrant entry by the agents. More importantly, exigent circumstances permitted the agents to lawfully enter Tropical Travel, regardless of whether the store was open or closed, because the agents, under the circumstances here presented, reasonably believed that their surveillance operation had been uncovered and that important evidence was in immediate jeopardy of being destroyed or removed. *See United States v. Schaper,* 903 F.2d 891, 894–95 (2d Cir.1990). The surveillance was instituted after the agents had received reliable information,

both from a confidential informant and from consensually monitored phone calls, of substantial money laundering activities at Tropical Travel. In one instance, for example, a confidential informant, having been directed to go to Tropical Travel to pick up $100,000 to be laundered, was directed to the back office, where defendants Buitrago and Duran placed bundles of cash in his backpack. *See* Affidavit of Timothy J. Ryan (lead agent in the overall investigation), dated Nov. 1, 1996, at ¶ 4. The agents had also received specific information that $40,000 in to-be-laundered funds was to be picked up from the premises on October 2, 1995. Tr. 236–37.

In these circumstances, it was objectively reasonable for the agents to believe that the bag delivery they had witnessed around 5:35 p.m. was a deposit of substantial amounts of cash that was in the process of being "laundered" and that a person objectively identified with the security of the premises (Anthony Duran) had now, minutes before the entry, uncovered the surveillance operation. Indeed, if, as the defense asserts, the agents should have regarded the premises as already closed to the public, it would have only added further exigency to their already ample basis for believing that, now that their surveillance had been detected, important evidence of serious criminal activity was in immediate jeopardy of being destroyed or removed. *See United States v. Zabare,* 871 F.2d 282, 290–91 (2d Cir.), *cert. denied,* 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989) (warrantless search justified by exigent circumstances of preventing destruction of evidence and protecting the undercover operation). Thus, the Court finds that exigent circumstances justified the warrantless entry into Tropical Travel on the evening of October 2, 1995.[1]

■ With respect to the general search of the premises that occurred following the initial entry and protective sweep, the Court hereby reaffirms its findings, made shortly after Ms. Chacon testified at the evidentiary

---

1. Defendants' reliance on *United States v. Tovar–Rico,* 61 F.3d 1529 (11th Cir.1995), is misplaced. The *Tovar–Rico* court found that there were no exigent circumstances because there was every reason to believe that suspects were "unaware of

police activity," since "the surveillance agents took great pains, and were successful, in concealing their presence." *Id.* at 1535. Here, by contrast, there was every reason for the agents to believe that their presence had been unmasked.

hearing, that Ms. Chacon gave consent to search the premises by knowingly and voluntarily signing the Spanish-language consent form. *See* Tr. at 174–75. As to the question previously left open by the Court as to whether Ms. Chacon had sufficient actual or apparent authority to lawfully provide such consent, the Court now finds that she had both. Even crediting, *arguendo,* defendants' evidence that Ms. Chacon's duties were those of a receptionist and that defendant Duran was the supervisor in Ms. Buitrago's absence, *see* Tr. at 71, 462, 537, Ms. Chacon still possessed substantial "common authority over the premises," *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990), since it is evident from the videotape as well as from the testimony (*e.g.* Tr. 109–11) that she had personal access to each of the three rooms of Tropical Travel's compact space and the ability to allow others into these areas.

In this regard, the Court specifically discredits defendant Duran's testimony that Ms. Chacon did not have access to the back office, and draws the adverse inference. Moreover, even if Duran's testimony were truthful in this respect, the agents could still have reasonably believed that Ms. Chacon did have such access, *see United States v. Elliott,* 50 F.3d 180, 185–86 (2d Cir.1995), in light of the fact that, when the agents entered, Ms. Chacon herself was behind the middle office counter with defendant Duran and the door to the adjacent back office was open. *See* Tr. at 18–20. In addition, the agents had observed Ms. Chacon locking the premises and had reasonably inferred her common authority over the entire premises. Tr. at 243. This was amply sufficient to authorize the overall search of the premises. *See e.g., Elliott,* 50 F.3d at 185–86; *United States v. Davis,* 967 F.2d 84, 87 (2d Cir.1992).

While this lawful search of the premises validates the seizure of some of the evidence here sought to be suppressed, it does not extend to the seizures from the locked safe. Specifically, the Court finds that Ms. Chacon's general consent to search the premises—even assuming it preceded the search of the safe (a point somewhat in dispute)—did not encompass permission to search the locked safe, nor could the agents reasonably have believed otherwise. *See Florida v. Jimeno,* 500 U.S. 248, 249–52, 111 S.Ct. 1801, 1802–04, 114 L.Ed.2d 297 (1991) (although concluding that a consent to search an automobile also encompassed consent to search a brown paper bag lying on the car's floor, the Court expressly noted that a locked briefcase in the trunk of the car would likely not be encompassed by a general consent to search the automobile). While obtaining a general consent to search the premises from Ms. Chacon, the agents never sought her specific permission to open the locked safe. They accepted that she did not know the combination to the safe, *see, e.g.,* Tr. at 204, and from their questioning of both Ms. Chacon and Ms. Duran, they recognized and understood that only Ms. Duran had access to the safe. *See, e.g.,* Tr. at 196, 288.

■ Nonetheless, even though a search of the safe did not fall within the scope of Ms. Chacon's general consent, the search and concomitant seizure were nonetheless lawful, because Ms. Duran consented to such a search and voluntarily opened the safe for the agents. The Court discredits Ms. Duran's testimony that the agents threatened and coerced her into opening the safe. *See* Tr. at 538–49. Quite apart from the contrary testimony of the agents, *see, e.g.,* Tr. at 28–30, 85–88, 198–202, which the Court credits, this is the unusual case in which the agents' conduct was videotaped, unbeknownst to them, by the Tropical Travel security camera. While the tape does not provide sound or show what went on in the back office (where the safe was located), overly-aggressive agents would presumably have evidenced such conduct in the areas being taped, since they were concededly unaware of the camera until well after their entry. Instead, the tape shows the agents proceeding in a rapid but professional manner, without any hint of coercion or threat. Even the defendants effectively concede that the agents did not brandish weapons or physically intimidate anyone.

Resolving the conflicts in the testimony, moreover, the Court expressly finds that at no point did defendant Duran object to opening the safe. While, after voluntarily agree-

ing to do so, she stalled by asking for a glass of water and asserting difficulty in remembering the combination, it is clear that her concern was not over opening the safe *per se* but over whether she (as opposed to others) would get in trouble for what was inside. *See* Tr. at 30, 550. The search of the safe and the seizure of its contents are therefore the product of a valid consent.

For the foregoing reasons, the Court hereby denies defendants' motion to suppress evidence seized in connection with the October 2, 1995 search of Tropical Travel. Since all other aspects of this case have previously been reassigned to Judge Jones and this remaining aspect is now resolved, the parties are directed to promptly contact Judge Jones' Chambers for instruction on how to proceed with the case.

SO ORDERED.