**Peter T. DeVITTORIO, Ralph Tancredi, Michael Marinelli and Edward Arce, Plaintiffs,**

v.

**David HALL, individually, Anthony Marraccini, individually, and the Town/Village of Harrison, New York, Defendants.**

No. 07 Civ. 0812(WCC).

United States District Court, S.D. New York.

Nov. 7, 2008.

Lovett & Gould, White Plains, NY (Jonathan Lovett, of Counsel), for Plaintiffs.

Bond, Schoeneck & King, PLLC, Garden City, NY (Mark N. Reinharz, of Counsel), for Defendants.

### OPINION AND ORDER

CONNER, Senior District Judge.

Plaintiffs, Peter DeVittorio ("DeVittorio"), Michael Marinelli ("Marinelli"), Ralph Tancredi ("Tancredi") and Edward Arce ("Arce"), bring this action under 42 U.S.C. § 1983 alleging violations of their rights under the First, Fourth and Fourteenth Amendments of the United States Constitution and violations of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2520 ("Title HI"). Defendants, David Hall ("Hall"), Anthony Marraccini ("Marraccini") and the Town/Village of

Harrison, New York (the "Town" or "Harrison") move for summary judgment pursuant to FED. R. CIV. P. 56. For the reasons stated below, defendants' motion is granted.[1]

## BACKGROUND

Plaintiffs are police officers for the Town Police Department (the "Department"). Plaintiffs DeVittorio and Marinelli are members of the Police Benevolent Association ("PBA"); at the time relevant to this lawsuit Tancredi was the PBA President and Arce was the PBA Sergeant–At–Arms. (Complt.¶¶ 3–6.) Plaintiffs allege that Hall, the Town's Chief of Police, and Marraccini, a Captain in the Department, installed a closed-circuit television camera and audio recorder in the men's locker room at Police Headquarters. (Id. ¶¶ 7–10.) They claim that defendants used the equipment to tape officers in various states of undress, and record and listen to private conversations regarding alleged departmental corruption and plaintiffs' objectives as members and officers of the PBA. (Id. ¶ 11.)

Plaintiffs Marinelli and Tancredi claim that in retaliation for their reporting the camera and expressing concerns as PBA members, defendants gave them assignments usually given to junior members of the Department, and Marraccini gave a permanent investigative assignment to another officer after proposing earlier that it

go to Marinelli. (Id. ¶¶ 21–23.) In a February 2006 meeting, in which DeVittorio expressed his concerns about the incident, the PBA adopted a resolution to report the camera to an outside law enforcement agency. (Id. ¶¶ 24–25.) Plaintiffs claim that in March or April 2006 Marraccini made false accusations that Tancredi misspent PBA money and threatened disciplinary action against PBA members if they refused to report Tancredi. (Id. ¶ 26.)

### I. The Video Camera in the Locker Room[2]

In the spring of 2005, defendants became aware of incidents of vandalism in the officer locker room at Police Headquarters. (Defs. R. 56.1 Stmt. ¶ 2.) Marraccini noticed that holes were kicked into the locker room walls, the lock on his locker was broken on four occasions and Hall's locker was glued shut on two occasions.[3] (Id. ¶¶ 3, 5.) It is uncontested that Marraccini was also aware that an eagle statue on Tancredi's locker was being repeatedly damaged. (Id. ¶ 4.)

The following details of the locker room are uncontested. There are 72 individual lockers within the locker room and both police officers and civilian members of the Department, such as custodians, have access to the room. (Id. ¶¶ 7–9, 11.) The door to the locker room has a combination

1. The parties captioned their motion papers *DeVittorio v. Hall* and *Carpinello v. Hall*, *DeVittorio* and *Carpinello* are related cases. However, since the parties address only the DeVittorio matter in the motion papers, this Opinion addresses and applies only to *DeVittorio*.

2. Plaintiffs deny most of the statements in defendants' Rule 56.1 Statement, often with little explanation or counter-statement. Plaintiffs have therefore made it difficult to provide a cohesive background on the uncontested facts. Therefore we provide the back-

ground using both plaintiffs' and defendants' facts and note where the facts are uncontested. Because the facts relevant to plaintiffs' claims are uncontested, we can conclude that there are no genuine issues of material fact, and that summary judgment is not inappropriate.

3. Plaintiffs state that Marraccini never used the locker and only after the camera was discovered was Marraccini's name put on it. (Pls. R. 56.1 Stmt. ¶ 115.) Plaintiffs also state that the damage to the wall was the result of a water leak. (Id. ¶ 116.)

lock but the combination is common knowledge and provided to anyone in the Department. (*Id.* ¶ 12.) The locker room contains the patrolman mailboxes, several message boards and an exercise area with equipment that can accommodate up to ten people at a time. (*Id.* ¶¶ 13–17.) There is a shower area and bathroom adjacent to the locker room in a separate area with doors. (*Id.* ¶¶ 20–21.)

Marraccini decided that a video camera without audio should be installed in the locker room to focus on his locker and identify the vandal(s). (*Id.* ¶¶ 23–24.) Marraccini spoke to Hall about it and Hall agreed to the installation. (*Id.* ¶ 25.) Marraccini asked Sergeant Dominick Pascale ("Pascale"), who handled the Department's telecommunications and computer system, to make the necessary arrangements. (*Id.* ¶¶ 26–27.) Pascale contacted Andrew Natarelli ("Natarelli") of Alcorn Systems, Inc., who had done prior work for the Department in installing and maintaining telecommunications systems and equipment. (*Id.* ¶¶ 28–29.)

After speaking with Pascale and Marraccini, Natarelli purchased a Color 380 LOR Mini Lens CMOS Camera (Model No. CNC7002ST), which has only video capability and no microphone or audio capability. (*Id.* ¶ 31.) Only two wires were attached to the camera, one for video and one for the power source, for the camera to have any audio capability it would have to have a microphone and three wires attached. (*Id.* ¶¶ 32–33.) In April or May 2005 Pascale and Natarelli installed the camera in the ceiling of the locker room without a microphone or any audio capability. (*Id.* ¶¶ 34–35.)

Plaintiffs viewed the camera on April 10, 2008 at Police Headquarters with their attorney and defendants' attorney and noted that the camera had three small wires projecting from it and a larger black wire with an apparent connector. (Pls. R. 56.1 Stmt. ¶ 93.) Plaintiffs state that prior to this Marraccini had shown Tancredi the camera and holding the larger black wire had said: "This was never hooked up." (*Id.* ¶ 96.)

Computer software, known as DigiVue, which controlled the functioning of the camera, was installed on Marraccini's computer in order for the camera to work. (Defs. R. 56.1 Stmt. ¶¶ 39–41.) Defendants allege that this software was not installed on any other computer in the Department. (*Id.* ¶ 42.) Plaintiffs state that Hall told Tancredi the camera was hooked up to Pascale's computer but thereafter Marraccini told Tancredi that it was hooked up to his computer. (Pls. R. 56.1 Stmt. ¶¶ 100–01.) It is uncontested that Marraccini did not open, access or use the software at any time, and although the camera was intended to work on a motion sensor, the motion sensor was never functioning because of a manufacturing defect in the DigiVue software. (Defs. R. 56.1 Stmt. ¶¶ 43–47.)

It is also uncontested that Pascale and Natarelli attempted to fix the problem but were unsuccessful, Natarelli contacted DigiVue for upgraded software but that software was never installed on any computer and because the motion sensor never worked, no video recordings were ever made of anybody. (*Id.* ¶¶ 49–52.)

The camera was installed to focus solely on Marraccini's locker but the field of view was too wide and both Marraccini's locker and the one next to it were visible. (*Id.* ¶¶ 55–59.) When plaintiffs discovered the camera, it was pointed down the middle of an aisle of lockers. (Pls. R. 56.1 Stmt. ¶ 119.) Pascale and Natarelli attempted to correct the field of view but were unable to fix the problem. (Defs. R. 56.1 Stmt. ¶ 60.)

On May 4, 2005, Pascale and Natarelli were able to capture two still pictures from

the camera using the DigiVue software, however, these are the only pictures that were ever taken by the camera and there are no people visible in either picture. (*Id.* ¶¶ 61–62.) Defendants swear in their affidavits that at no time did Pascale, Natarelli, Marraccini or Hall ever see or hear about any recordings or pictures of anyone in the locker room. (*Id.* ¶¶ 63–66.) Marraccini and Hall swear that at no time did they ever observe anyone on the camera in the locker room. (*Id.* ¶¶ 67–68.) In mid to late 2005, Marraccini instructed Pascale to "get rid of" the camera and un-install the DigiVue software. (*Id.* ¶ 70.) The software was uninstalled but the two still pictures were saved on Marraccini's computer. (*Id.* ¶¶ 71–73.) Although the camera was not functional, it remained in the vent above Marraccini's locker for several months. (*Id.* ¶ 79.)

Marraccini and Pascale both state that Tancredi asked them several times if a camera could be installed in the locker room because of the vandalism and damage done to the eagle statue on his locker. (*Id.* ¶¶ 74–76.) Lieutenant Deborah Schuck states in her affidavit that she heard Tancredi ask Pascale about installing a camera in the locker room. · (*Id.* ¶ 77.) Tancredi denies ever making this inquiry. (Lovett Aff'm., Ex. 2 at ¶ 28.)

In December 2005 an officer in the Department saw the camera hanging through an opening in the vent. (Defs. R. 56.1 Stmt. ¶¶ 80–81.) At a subsequent PBA meeting Marraccini, a PBA member, stated "something to the effect that the purpose of the camera was not to observe people in the locker room, *e.g.*, that he was not 'gay' and was not looking at their private areas." (*Id.* ¶ 82.) [4] Marraccini showed the camera to Tancredi and advised him that it was not hooked up properly and never worked. (*Id.* ¶ 83.) It is uncontested that Marraccini told Tancredi he would be willing to have an outside investigation done and would do anything to establish a comfort level with the officers. (*Id.* ¶¶ 84–85.) Tancredi told Marraccini that was not necessary and no criminal charges were brought against the Department as a result of the incident. (*Id.* ¶¶ 86–87.) It is also uncontested that in December 2005 Hall had a meeting with Tancredi and PBA counsel Richard Bunyan, during which Bunyan indicated that they intended to report the incident to an outside law enforcement agency. (*Id.* ¶¶ 88–89.) Hall offered to turn over the camera matter to either the Westchester County District Attorney's Office, the Westchester County Police or the New York State Police. (*Id.* ¶ 91.) Plaintiffs state that Hall told Tancredi that the camera "was never hooked up. No audio, no audio." (Pls. R. 56.1 Stmt. ¶ 94.) Plaintiffs state that Hall also claimed that he did not know the camera had been installed in the locker room. (*Id.*) Plaintiffs also claim that shortly after the camera was discovered Marraccini and Hall stated that the camera was installed to investigate graffiti on Officer Detlef's locker. (*Id.* ¶ 97.)

## II. Alleged Retaliatory Actions Against Tancredi and Marinelli

There are six "posts" within the Department's geographic territory to which officers are assigned. (Defs. R. 56.1 Stmt. ¶ 93.) The only difference between the posts is the geographic area covered; the duties required are essentially the same. (*Id.* ¶¶ 94–96.) Defendants state that, although at certain times Post 1 may involve walking, neither Post 1 nor any post in the

---

4. Plaintiffs state that Marraccini told members of the PBA: "I did not covertly videotape anyone in the locker room ... I am not a homosexual ... I was not watching your balls." (Pls. R. 56.1 Stmt. ¶ 95.)

Department is considered a "walking post." (*Id.* ¶¶ 99–100.) Plaintiffs state that as a form of punishment they have been assigned to Post 1 as a walking post. (Pls. R. 56.1 Stmt. ¶ 102.) It is uncontested that neither Post 1 nor any other post is designated in any way as a "junior post" or a post to be assigned to junior officers. (Defs. R. 56.1 Stmt. ¶ 102.) The Squad Sergeant for a tour of duty is responsible for assigning officers to specific posts. (*Id.* ¶ 103.) Marinelli was regularly assigned to Posts 2, 3, 4 and 5 both before and after December 31, 2005 and was not assigned to Post 1 on a single occasion during January 2006. (*Id.* ¶¶ 104–05.) Tancredi was not assigned to Post 1 or 2 on any occasion between December 31, 2005 and January 31, 2006. (*Id.* ¶ 106.)

On July 24, 2006, Hall promoted Police Officer Issa Kharouba ("Kharouba") to the rank of Detective. (*Id.* ¶ 107.) Defendants state that this decision was based on a number of factors, including Kharouba's exemplary record with the Department, attendance, seniority and prior experience as a police officer with the New York City Police Department (the "NYPD"). (*Id.* ¶ 108.) Defendants state that Hall decided to promote Kharouba instead of Marinelli because Marinelli did not have prior experience that was comparable to Kharouba's experience with the NYPD. (*Id.* ¶ 109.)

In October 2006, Hall appointed Sergeant Michael Olsey ("Olsey") as Commander of the Detective Division. (*Id.* ¶ 121.) Defendants state that Hall was not aware that DeVittorio had an interest in this position and if he had known, he would have had grave doubts about DeVittorio's ability to successfully fill the position because of prior complaints and incidents. (*Id.* ¶¶ 123–26.) Defendants state that Marraccini was also unaware of DeVittorio's interest but had he been aware he would not have recommended DeVittorio for the same reasons. (*Id.* ¶¶ 128–29.)

Plaintiffs state that Marraccini was aware that DeVittorio was seeking promotion. (Pls. R. 56.1 Stmt. ¶ 121.)

In or about 2006, it came to Marraccini's attention that Tancredi was misappropriating PBA funds and Marraccini informed Hall and members of the PBA about the alleged misappropriation. (Defs. R. 56.1 Stmt. ¶¶ 131–35.) In or about the fall of 2006 Marraccini also reported the misappropriation to the Westchester County District Attorney's Office and requested that it undertake an investigation into the matter. (*Id.* ¶ 136.) Tancredi explained the disbursements to the PBA and immediately re-paid the PBA. (Pls. R. 56.1 Stmt. ¶ 107.) Plaintiffs state that Marraccini demanded Tancredi's resignation as PBA president after the PBA voted to investigate the camera incident. (*Id.* ¶ 110.)

## DISCUSSION

### I. *Standard of Review*

Summary judgment is appropriate when there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. *See* FED. R. CIV. P 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has carried its burden, the opponent must do more than simply show that there is "some metaphysical doubt as to the material facts," it must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citation omitted; emphasis in original). "In moving for summary judgment against a party who will bear the

ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) In deciding whether to grant summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## II. *Fourth Amendment*

■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV; *see also Arizona v. Evans*, 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). The Fourth Amendment is a personal right that must be invoked by an individual. *See Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("[T]he Fourth Amendment protects people, not places."). But the " 'capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.' " *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)) (alteration in original). Whether a person possesses standing to object to a search turns on whether that person has a " 'reasonable expectation of freedom from governmental intrusion' " in the areas searched.[5] *United States v. Buitrago Pelaez*, 961 F.Supp. 64,

67 (S.D.N.Y.1997) (quoting *Katz*, 389 U.S. at 352, 88 S.Ct. 507). An individual lacks "standing" in the Fourth Amendment context "when his contacts with the searched premises are so attenuated that no expectation of privacy he has in those premises could ever be considered reasonable." *United States v. Fields*, 113 F.3d 313, 320 (2d Cir.1997).

■ The Fourth Amendment protects individuals from unreasonable searches conducted by the government, even when the government acts as an employer. *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (citing *O'Connor v. Ortega*, 480 U.S. 709, 717, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987)). The safeguards of the Fourth Amendment apply to both residential and commercial premises. *New York v. Burger*, 482 U.S. 691, 699, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). The government employer becomes engaged in a search only when the inquiry intrudes upon an area where the employee has a reasonable expectation of privacy. *Lukas v. TriBorough Bridge & Tunnel Auth.*, 1993 WL 597132, at *5 (E.D.N.Y. Aug.18, 1993) (citing *O'Connor*, 480 U.S. at 715, 107 S.Ct. 1492; *Coppinger v. Metro–North Commuter R.R.*, 861 F.2d 33, 35 (2d Cir. 1988)). In this case, plaintiffs must show that their expectation of privacy from covert surveillance in the locker room of Department Headquarters is "an expectation of privacy that society is prepared to consider reasonable." *O'Connor*, 480 U.S. at 715, 107 S.Ct. 1492 (internal quotation marks and citation omitted). Whether a public employee has a reasonable expectation of privacy depends on the context of

---

**5.** Defendants argue that to establish standing plaintiffs must show that they were recorded or observed through the camera or that their conversations were actually intercepted or recorded. (Defs. Mem. Supp. Summ. J. at 5.) The Court notes that this is not the standard

for Fourth Amendment standing, but is rather an argument that addresses the question whether a "search" was conducted by defendants. Accordingly, we examine these issues *infra.*

the employment relationship and must be determined on a "case-by-case basis." *Id.* at 717–18, 107 S.Ct. 1492.

In *Thompson v. Johnson County Community College,* the defendants videotaped activities in the security personnel locker room. 930 F.Supp. 501, 503 (D.Kan.1996). The area was used to store personal belongings and as a dressing and changing room. *Id.* The area also contained equipment for the College's heating and air-conditioning systems, and the storage room was not locked. *Id.* The plaintiffs as well as maintenance personnel, service personnel and other college employees had access to the room. *Id.* at 503–04. The defendants installed a video surveillance camera in the area after security personnel had reported incidents of theft from their lockers and after receiving reports that certain night-shift security personnel were bringing prohibited weapons on campus. *Id.* at 504. The video surveillance camera installed was a video-only recorder without audio capability. *Id.* The surveillance camera recorded activity in the locker area between the hours of 10:30 p.m. and 6:30 a.m. *Id.*

The court found that the plaintiffs did not have a reasonable expectation of privacy in the security personnel locker area because the area was not enclosed, the plaintiffs' activities could be viewed by anyone walking into or through the area and other college personnel also had regular access to the area. *Id.* at 507. The Tenth Circuit affirmed the district court. *Thompson v. Johnson County Community College,* 108 F.3d 1388, 1997 WL 139760 (10th Cir.1997) ("Thus, an individual may be able to assert a right to privacy in his personal locker. We have not found, however, that an individual may have a reasonable expectation of privacy in the area surrounding a locker.").

In *Trujillo v. City of Ontario,* the defendants installed a surveillance camera be-hind a ceiling tile in a police-station locker room after an officer filed a police report stating that his flashlight had been stolen and there were rumors of other thefts in the locker room. 428 F.Supp.2d 1094, 1098–99 (C.D.Cal.2006). The camera was connected to a time-lapse video cassette recorder ("the VCR") located in the office of the Communications Sergeant. *Id.* at 1099. While the locker room contained showers, toilets, urinals and sinks, the camera recorded only the area around one officer's locker. *Id.* Officers regularly changed, showered and used the sinks, toilets and urinals in the locker room, but the general public, suspects and arrestees had no access to the locker room. *Id.* An officer found a tape in the VCR containing recorded images of the locker room which depicted the same portion of the locker room throughout, and displayed several officers in various states of undress. *Id.* at 1100.

The court determined that while minimal intrusions were likely to occur in a locker room and the plaintiffs had no reasonable expectation of privacy from those intrusions, that did not diminish the reasonableness of a person's expectation to be free from covert video surveillance. *Id.* at 1104. The court found that the act of recording the plaintiffs while in the locker room distinguished the search from an average visual search and was far more intrusive. *Id.* at 1107. Thus, considering the totality of the circumstances the court held that the plaintiffs had a reasonable expectation of privacy from covert video surveillance while in the locker room. *Id.* The Ninth Circuit affirmed the district court, noting that the secret videotaping of a locker room used for private behavior and not accessible to the public violated the plaintiffs' Fourth Amendment rights. *Bernhard v. City of Ontario,* 270 Fed. Appx. 518, 519–20 (9th Cir.2008).

In *Avila v. Valentin–Maldonado*, a surveillance camera was installed in a police-station locker-break room that housed the lockers assigned to each police officer to store their official equipment. 2008 WL 747076, at *12 (D.Puerto Rico Mar.19, 2008). Based on complaints filed by a female officer alleging that she was being sexually harassed by someone and notes were being placed in her locker implying that she could be subjected to disciplinary action for bringing a false accusation of sexual harassment, the defendants installed the camera. *Id.* at *14. A hollow was made in the ceiling and the camera was focused on that female officer's locker. *Id.* The camera was a video camera with no audio, and it recorded live images continuously which were transmitted from the camera to a video cassette. *Id.* The camera was installed on or about the first week of April 2004 and was taken down on May 3, 2004. *Id.* at *15.

The locker room lockers were half-sized lockers intended for storing official equipment. *Id.* at *12. Within the locker-break room there was a bathroom with its own door as well as a small enclosed space used to hold evidence taken from detainees. *Id.* The area served as a multi-purpose room for both female and male personnel to eat, reheat food or store their equipment in the lockers, enter the bathroom or gain access to the evidence room. *Id.* It contained a table with four chairs, a refrigerator and a telephone but no radio, television or couch. *Id.* The locker-break room was intended for the use of all of the employees of the Police Service. *Id.* The court found that the locker-break room was intended to be used by a limited group of people for activities outside the presence of the general public. *Id.* at *13. The purpose of the room was inherently private. *Id.* Based on these circumstances, the court determined that no reasonable jury could find that plaintiffs did not have a reasonable expectation of being free from covert video surveillance while in the locker-break room. *Id.*

■ According to the uncontested facts before us, the locker room at Department Headquarters has a combination lock, the combination is known by every police officer or civilian member of the Department. The room contains 72 lockers, an exercise area on two sides, mailboxes, bulletin boards with notices and a separate shower and bathroom area with its own door. Marraccini was aware that a statue on Tancredi's locker was being repeatedly knocked over and damaged. A video camera was installed in the ceiling by access through the attic. Marraccini never opened or accessed the DigiVue software on his computer, the motion sensor of the camera never worked because of the software defect and attempts to fix the camera to make it functional were unsuccessful. Because the motion sensor never worked, no video recordings were ever made of anybody or anything.

In the cases discussed above, the courts determined that the plaintiffs either did not have a reasonable expectation of privacy in an employee locker room, or had a reasonable expectation of privacy from covert video surveillance while in the employee locker room. Plaintiff has not offered, nor is this Court aware of, any case that has found a general right of privacy in an employee locker room. The locker room at the Department Headquarters was accessible to all employees in the Department at any time and was used for general purposes aside from changing clothes, such as storing personal equipment, using exercise equipment, getting mail and reading notices. A bathroom and shower area were entirely separate from the locker room with a separate door. Therefore, we can not conclude that there is a reasonable expectation of privacy whenever an employee is in the locker

room generally. However, given the fact that the room is used for private functions, such as changing clothes, plaintiffs do have a reasonable expectation of privacy from covert video surveillance while in the locker room. But plaintiffs offer no evidence that defendants secretly recorded them or viewed them live from the camera and do not contest that "no video recordings were ever made of anybody or anything."

■■ Even were we to conclude that plaintiffs had a reasonable expectation of privacy, plaintiffs must still present evidence that a search occurred and that it was unreasonable. A "search" occurs " 'when an expectation of privacy that society is prepared to consider reasonable is infringed.' " *United States v. Karo*, 468 U.S. 705, 712, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). To determine whether a search is reasonable, the court examines the totality of the circumstances. *See Samson v. California*, 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " *Id.* (citing *United States v.*

*Knights,* 534 U.S. 112, 118–19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001)).

■ In *Karo,* the Supreme Court determined that a can containing an unmonitored beeper infringed no privacy interest. 468 U.S. at 712, 104 S.Ct. 3296. The Court noted that "it created a potential for an invasion of privacy, but we have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment.... It is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence." *Id.* Surely the installation of the camera created the potential for an invasion of privacy, but as the camera did not work and recorded no images, other than two still pictures of the lockers,[6] it conveyed no private information at all and, therefore, did not infringe on anyone's privacy interest. There being no reasonable expectation of privacy and no search, plaintiffs' have not shown a violation of their Fourth Amendment rights.[7]

Finally, defendants would also be entitled to summary judgment on the basis of qualified immunity even if there were a constitutional violation. The defense of qualified immunity is established when (1) at the time defendants acted, it was unclear whether plaintiff's asserted interests

---

6. Plaintiffs have no reasonable expectation of privacy from the making of still pictures of the outside of their lockers because the outside of the lockers are observable by any member of the Department who enters the locker room. *See Florida v. Riley*, 488 U.S. 445, 450–51, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (finding no reasonable privacy expectation in open property to the extent that it is feasibly observable from airspace).

7. Plaintiffs argue that the "inability to **record** by means of video of course has nothing whatsoever to do with being able to watch on a remote basis live through the camera lens what ever was going on in the locker room."

(Pls. Mem. Opp. Mot. Summ. J. at 8 (emphasis in original).) However, plaintiffs offer no evidence that any defendants watched them live from a remote location and defendants deny ever observing plaintiffs live. Plaintiffs attempt to persuade the Court that defendants impliedly admitted to live observation because they did not deny it at the time plaintiffs discovered the camera. (*Id.* at 8–9.) However, because plaintiff's offer nothing to support their argument and defendants affidavits deny any live observation, there is no genuine issue of material fact as to whether plaintiffs were observed live from a remote location.

were protected by federal law, or (2) defendants could have reasonably believed that their actions did not contravene an established federal right. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 531–32 (2d Cir.1993); *Dukes v. City of New York*, 879 F.Supp. 335, 344 (S.D.N.Y. 1995). A right is considered clearly established when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In order for public officials to be held liable for their discretionary acts, this Circuit has held that the "unlawfulness must be apparent." *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir.1996).

In *Patrolmen's Benevolent Association of City of New York v. City of New York*, 2000 WL 307377, at *3–4 (E.D.N.Y. Mar.26, 2000), a video camera was installed in the window blinds of the muster room, a room used for daily roll call, in-service training, witness interviews and the posting of notices, in an attempt to identify the person defacing the wanted posters. The court noted that whether a public employee has a reasonable expectation of privacy with respect to investigations for workplace misconduct is entirely dependent on the context and should be determined on a "case by case" basis. *Id.* at *2 (citing *O'Connor*, 480 U.S. at 717–18, 107 S.Ct. 1492). The court found that this "highly variable, fact-specific standard has produced varied results and cannot be said to delineate a clearly established right for qualified immunity purposes." *Id.* In light of this, and the varied case law regarding surveillance of employee locker areas discussed above, defendants would not understand that their actions violated a clearly established constitutional right.

## III. *Title III*

Under Title III, only an "aggrieved person" has standing to challenge the validity of a wiretap. *See United States v. Columbo*, 2006 WL 2012511, at *8 (S.D.N.Y. July 18, 2006) (citing 18 U.S.C. § 2518(10)(a)). An aggrieved person is defined as a "person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11); *see United States v. Howard*, 400 F.Supp.2d 457, 474 (N.D.N.Y.2005) (finding the defendant lacked standing to move to suppress interceptions of conversations that were not directed toward him and to which he was not a party). Although the parties vigorously contest whether the camera had audio capability or not, plaintiffs have presented no evidence nor do they allege that any conversations were intercepted or recorded, let alone any conversations to which they were a party. Therefore, plaintiffs do not have standing to bring a claim under Title III.

## IV. *First Amendment*

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). To establish a violation of those rights, a government-employee plaintiff "must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him." *Hale v. Mann*, 219 F.3d 61, 70 (2d Cir.2000) (internal quota-

tion marks and citation omitted). "[A] federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior ... when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684 (determining the plaintiff's questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors and whether employees felt pressured to work in political campaigns were not questions of public import nor did they seek to bring to light a breach of public trust). " 'Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.' " *Ruotolo v. City of New York,* 514 F.3d 184, 189 (2d Cir.2008) (quoting *Lewis v. Cowen,* 165 F.3d 154, 163 (2d Cir.1999)); *see Pappas v. Giuliani,* 290 F.3d 143 (2d Cir. 2002); *Harris v. Merwin,* 901 F.Supp. 509, 512 (N.D.N.Y.1995).

Speech touches a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. "In reaching this decision, the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis,* 165 F.3d at 163–64. "The key inquiry is whether the statements were made by plaintiff in her role as a disgruntled employee or her role as a concerned citizen." *Woods v. Enlarged City Sch. Dist. of Newburgh,* 473 F.Supp.2d 498, 530 (S.D.N.Y.2007) (Conner, J.) (determining the plaintiff's

speech was not protected by the First Amendment because she made complaints in private regarding the performance evaluations that she received and the racial discrimination to which she was subjected; her speech was not designed to reveal District-wide racism, or address the impact of racism on the school environment). In *Harris,* a professor spoke out about the appointment of an individual without "academic rank" to the chairmanship of his department. 901 F.Supp. at 511. The court held that the speech concerned a "personal grievance by a disgruntled public employee that Second Circuit courts have refused to characterize as speech protected by the First Amendment." *Id.* at 513. The court went on to state that the plaintiff did not allege, and there was no evidence to suggest, that he spoke out about any wrongdoing, fraud, or abuse on the part of the college that the general community would consider important. *Id.*

Plaintiffs' complaints regarding the installation of a surveillance camera in the locker room did not address a matter of public concern. Plaintiffs claim the camera was an invasion of their privacy in the employee locker room, and do not make any argument how this would concern the public or the public well-being. This Court cannot see plaintiffs' grievances as anything but personal. Plaintiffs argue that their complaints were about violations of the Omnibus Act and New York law and not merely grievances against working conditions. (Pls. Mem. Opp. Mot. Summ. J. at 21.) However, it is not sufficient at this point to assert what plaintiffs' complaints were not; plaintiffs must show a genuine issue of material fact as to whether their speech touched upon matters of public concern.

The Complaint and Plaintiffs' Rule 56.1 Statement reveal that Marinelli reported the discovery of the camera to Tour Super-

visor Sergeant Vincent Musollino and Tancredi demanded that Hall and Marraccini safeguard all evidence pertaining to the camera. The record also reveals that Tancredi and PBA counsel Richard Bunyan advised Hall that the PBA intended to report the locker room surveillance camera to an outside law enforcement agency; however, plaintiffs present no evidence that this was ever done. Even considering this evidence in the light most favorable to plaintiffs, there is no evidence they spoke out about any wrongdoing, fraud, or abuse on the part of the Department that the general community would consider important. *See Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir.2008) (determining the plaintiffs' speech that they worked overtime without compensation, in violation of Fair Labor Standards Act, did not involve a matter of public concern because it related only to internal employment policies of the City and was made only in the plaintiffs' capacity as employees and not as a citizens). Because plaintiffs did not engage in constitutionally protected speech they do not have a claim for violation of their First Amendment rights.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment (Doc. # 20) is granted. Judgment to be entered by the Clerk of the Court.

SO ORDERED.